Kelly Trotter and Franzen
John C. Kelly (SBN 125609)
111 West Ocean Boulevard 14th Floor
PO Box 22636
Long Beach, CA 90801-5636
Tel: 562.432.5855
jckelly@kellytrotter.com

Powers Pyles Sutter & Verville PC
Matthew S. Freedus
Rosie Dawn Griffin
1250 Connecticut Avenue NW, 8th Floor
Washington, DC 20036
Tel: 202.466.6550
matthew.freedus@powerslaw.com
rosie.griffin@powerslaw.com

*Attorneys for Defendants Eisner Health, Kendra L. Segura, M.D., and Catherine L. Jacobs, CNM*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| VERONICA PAZ AGUILAR et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>CATHERINE L. JACOBS, CNM, et al.,<br><br>*Defendants*. | Case No. 2:24-cv-08715 MRA-MAR<br><br>**DEFENDANTS EISNER HEALTH, KENDRA L. SEGURA, M.D., AND CATHERINE L. JACOBS, CNM OPPOSITION TO THE UNITED STATES' MOTION TO REMAND**<br><br>Honorable Mónica Ramírez Almadani<br>United States District Judge |

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

STATUTORY AND REGULATORY BACKGROUND .......... 3

FACTUAL AND LEGAL BACKGROUND .......... 5

LEGAL STANDARD .......... 8

ARGUMENT .......... 9

- I. The Government Cannot Retroactively Narrow the Eisner Defendants' Deemed PHS Employee Status .......... 10
- II. The Eisner Defendants Acted Within the Scope of Their Deemed Federal Employment When Providing Medical Care to an Established Patient .......... 13
  - A. The Eisner Provider Defendants Acted Within The Scope of Their Deemed Federal Employment .......... 14
  - B. The Acts and Omissions at Issue Related to Grant-Supported Activity .......... 16
  - C. Eisner's Provision Of Care To Its Own Patients At CHMC Was Not An "Other Line of Business" .......... 18
- III. The Particularized Determination Process Is Inapplicable Here .......... 20

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Federal Cases**

*Agyin v. Razmzan*,
986 F.3d 168, 184 (2d Cir. 2021) ........ 14, 20, 23
*Alexander v. Mount Sinai Hosp. Med. Ctr.*,
484 F.3d 889 (7th Cir. 2007) ........ 10, 11
*Blumberger v. Tilley*,
115 F.4th 1113 (9th Cir. 2024) ........ passim
*Bray v. Bon Secours Mercy Health, Inc.*,
97 4th 403 (6th Cir. 2024) ........ 4
*Cromer v. Dignity Health*,
2025 WL 1153808 (C.D. Cal. Apr. 18, 2025) ........ 21, 22
*Friedenberg v. Lane County*,
68 F.4th 1113 (9th Cir. 2023) ........ 7, 20, 21, 22
*Hui v. Castaneda*,
559 U.S. 799 (2010) ........ 1, 15
*Kashin v. Kent*,
457 F.3d 1033 (9th Cir. 2006) ........ 2, 13, 23
*Krandle v. Refuah Health Ctr., Inc.*,
No. 22-cv-4977, 2024 WL 1075359 (S.D.N.Y. Mar. 12, 2024) ........ 15
*McLachian v. Bell*,
261 F.3d 908 (9th Cir. 2001) ........ 14
*Nat. Res. Def. Council v. U.S. Env't Prot. Agency*,
38 F.4th 34 (9th Cir. 2022) ........ 19
*O'Brien v. United States*,
56 F.4th 139 (1st Cir. 2022) ........ 3, 20
*Pediatric & Fam. Med. Found. v. Becerra*,
2021 WL 3878647 (9th Cir. Aug. 31, 2021) ........ 11, 19, 17
*Pediatric & Fam. Med. Found. v. HHS*,
No. 17-cv-00732 (C.D. Cal. July 18, 2022) ........ 11
*Smith v. Harbison*,
No. 4:19-cv-152, 2020 WL 6216758 (M.D. Ga. Oct. 22, 2020) ........ 23
*Stoker v. United States*,
No. 21-55993, 2022 WL 2452304 (9th Cir. July 6, 2022) ........ 14, 25

*Thomas v. Phoebe Putney Health Sys., Inc.*,
2019 WL 6039976 (M.D. Ga. March 6, 2019)....23
*United States v. Smith*,
499 U.S. 160 (1991) ....15

**State Cases**

*Perez v. Van Groningen & Sons, Inc.*,
719 P.2d 676 (Cal. 1986)....25

**Federal Statutes**

5 U.S.C. § 706(2)(A)....19
28 U.S.C. § 1346(b)(1).... 2, 14, 23
42 U.S.C. § 233 .... 12, 15
42 U.S.C. § 233(a) .... *passim*
42 U.S.C. § 233(g) .... 2, 9, 21
42 U.S.C. § 233(g)(1)(A)....20
42 U.S.C. § 233(g)(1)(B) .... 4, 22, 20
42 U.S.C. § 233(g)(1)(B)(i) .... 5, 17, 20
42 U.S.C. § 233(g)(1)(B) .... 17, 21
42 U.S.C. § 233(g)(1)(D)....8, 9
42 U.S.C. § 233(g)(1)(F).... 16, 19
42 U.S.C. § 233(g)(4)....9
42 U.S.C. § 233(g)(5)(B) .... 15, 17
42 U.S.C. § 233(*l*)(1) ....12
42 U.S.C. § 254b.... 4, 6, 9
42 U.S.C. § 254b(a) ....5, 26
42 U.S.C. § 254b(b)(1)(A).... 3, 5, 24
42 U.S.C. § 254b(e)(1)....16
42 U.S.C. § 254b(e)(5)(D) ....28
42 U.S.C. § 254b(k)(1)....6
42 U.S.C. § 254b(k)(3).... 3, 5, 24
Public Health Service Act.... passim
Pub. L. No. 102-501....7
Pub. L. No. 104-73, 109 Stat. 777 (1995)....7

**Federal Regulations**

42 C.F.R. § 6.6 ....3, 23

42 C.F.R. § 6.6(c) .......... 24
42 C.F.R. § 6.6(d) .......... 16, 20
42 C.F.R. § 6.6(e)(4) .......... 31
42 C.F.R. § 51c.102(c) .......... 5
42 C.F.R. § 51c.102(e) .......... 5, 17
42 C.F.R. § 51c.303(a) .......... 5
60 Fed. Reg. 22,530, 22,531 (May 8, 1995) .......... 22

**Other Authorities**

Continuity of Care and Hospital Admitting at 36, HRSA (Mar. 2025), https://bphc.hrsa.gov/compliance/compliance-manual .......... 4

*Coverage for Health Centers and Their Covered Individuals*, https://bphc.hrsa.gov/sites/default/files/bphc/data-reporting/pal-2025-01.pdf .......... 8

U.S. Dep't of Health & Hum. Servs., Health Res. & Servs. Admin., *Policy Information Notice 2008-01: Defining Scope of Project and Policy for Requesting Changes* 1 (Jan. 13, 2009) .......... 4, 20, 21

U.S. Dep't of Health & Hum. Servs., Health Res. & Servs. Admin., *Federal Tort Claims Act Health Center Policy Manual* (2014), https://bphc.hrsa.gov/sites/default/files/bphc/technical-assistance/ftcahc-policy-manual.pdf .......... 15

U.S. Dep't of Health & Hum. Servs., Health Res. & Servs. Admin., *Policy Information Notice 97-6: Clarification of Certain Policies and Procedures for Health Centers Deemed Covered under the FTCA for Medical and Dental Malpractice Liability* (1997) .......... 20

U.S. Gov't Accountability Office, *Health Care Funding: Federal Obligations to and Expenditures by Selected Organizations Involved in Health-Related Activities, Fiscal Years 2013–2015*, GAO-18-204R (March 6, 2018) .......... 18

## INTRODUCTION

Defendants Eisner Pediatric and Family Medical Center—a federally-funded community health center deemed to be a Public Health Service (PHS) employee by the United States Department of Health and Human Services (HHS)—and its employees Kendra Segura, M.D., and Catherine Jacobs, CNM (collectively, "the Eisner Defendants"), are immune from Plaintiffs' claims under 42 U.S.C. § 233(a).

This case results from perinatal services the Eisner Defendants provided to an established Eisner patient, Plaintiff Veronica Paz Aguilar (Plaintiff Aguilar) whose medical records designate Eisner as her primary care physician. The alleged injury arose from Eisner's referral of Plaintiff Aguilar to California Hospital Medical Center (CHMC), an HHS-approved Eisner service site where Eisner-employed providers were allegedly negligent in their triage, testing, and discharge decisions. Section 233(a) immunizes such conduct, providing absolute protection from suits resulting from deemed and actual PHS employees' performance of medical or related functions undertaken within the scope of their federal employment. *Hui v. Castaneda*, 559 U.S. 799, 806 (2010); *Blumberger v. Tilley*, 113 F.4th 1113, 1117 (9th Cir. 2024) ("[I]mmunity for deemed PHS employees is identical to the immunity for true PHS employees.").

The narrow issue before the Court is whether the alleged conduct was within the scope of the Eisner Defendants' deemed federal employment. *See* 42 U.S.C. § 233(g) (reinforcing scope of § 233(a) immunity by mandating that it "shall apply with respect to services provided [] to *all patients of the entity*"); *id.*§ 233(g)(1)(B) ("The deeming … shall apply with respect to services provided … to all patients of the entity"), (F) ("[T]he Attorney General may not determine that the provision of services which are the subject of [Eisner's favorable deeming] determination are not covered under this section."). The applicable test is simple: whether the Eisner Defendants were working in furtherance of Eisner's HHS-approved federal project.

*Kashin v. Kent*, 457 F.3d 1033, 1037 (9th Cir. 2006) (citing 28 U.S.C. § 1346(b)(1)).

Avoiding honest engagement with this framework, the United States repeatedly asserts as fact the legal conclusion it seeks to establish: that the Eisner Defendants were *not* working within the scope of Eisner's grant-supported activities when the two named, Eisner-employed medical providers provided perinatal care to an established Eisner patient, at health delivery sites HHS expressly approved as part of Eisner's federal project. To support its preferred outcome, the Government instead advances a fiction—that Eisner's provision of services at CHMC constituted a "separate line of business" outside of Eisner's federal health center project. *See* United States of America's Motion to Remand, ECF No. 40 at 14 (hereinafter "U.S. Br."). The Government's argument fails: Eisner was obligated by statute to provide "obstetrics . . . gynecology [and] preventive health services, including[,] prenatal and perinatal services" to all residents of its service area "in a manner which assures continuity," 42 U.S.C. § 254b(b)(1)(A)(i)(I)–(II), (k)(3)(A), and Eisner's costs in providing these services were, with HHS's full knowledge and explicit approval, "grant-supported," 42 C.F.R. § 6.6.

The application of § 233(a) immunity in this case is "straightforward." *O'Brien v. United States*, 56 F.4th 139, 149 (1st Cir. 2022) ("With respect to patients of the health center, coverage is straightforward" and the Secretary's deeming determination applies to "all patients of the entity.") (quoting 42 U.S.C. § 233(g)(1)(B)). Where "a covered individual provided the services at issue to a patient of the covered entity, the services are covered." *Bray v. Bon Secours Mercy Health, Inc.*, 97 4th 403, 407, 415 (6th Cir. 2024). Because Plaintiff Aguilar was an Eisner patient and Eisner and its personnel were indisputably deemed to be federal employees during the relevant period, the key questions this Court must resolve in determining the propriety of substitution are (1) whether the Eisner Defendants were acting within the scope of their deemed federal employment when the

allegedly negligent acts and omissions occurred; and (2) whether the alleged acts and omissions were related to Eisner's grant-supported activities. The answer to both questions is yes. Accordingly, the Court should deny the Government's motion to remand, ECF 40, order the substitution of the United States in place of the Eisner Defendants, and deem this action as one brought under the Federal Tort Claims Act (FTCA).

## STATUTORY AND REGULATORY BACKGROUND

To be baseline eligible for the absolute immunity at issue, Eisner must meet the statutory definition of a "health center" and be funded as such under 42 U.S.C. § 254b. 42 U.S.C. § 233(g)(1)(B)(i). To qualify for this status and funding, Eisner must, "through the staff and supporting resources of the center or through contracts or cooperative arrangements," provide primary health care and related services to all the residents of an HHS-designated "medically underserved" area. 42 U.S.C. § 254b(a), (b)(1); 42 C.F.R. § 51c.102(c), (e). The statute's "required primary health services" include "obstetrics . . . gynecology," and "prenatal and perinatal services." § 254b(b)(1)(A)(i)(I), (III)(aa). Eisner must also assure continuity of care when providing these services. § 254b(k)(3)(A); 42 C.F.R. § 51c.303(a); HHS, Health Resources and Services Administration (HRSA), Health Center Program Compliance Manual, Ch. 8: Continuity of Care and Hospital Admitting at 36 (Mar. 2025), https://bphc.hrsa.gov/compliance/compliance-manual (hereinafter "Health Center Compliance Manual").

Congress gave HHS the ability to prescribe the "form and manner" of health center grant applications, as well as the "information" such applications must contain. § 254b(k)(1). Per HHS, health center applicants must detail their sites, services, providers, service area, and target populations when applying for funding. *See Documenting Scope of Project*, HRSA (Dec. 2023), https://bphc.hrsa.gov/compliance/scope-project/documenting-scope-project. These

five elements form a health center's "scope of project," *i.e.*, "the activities that the total approved section 330 grant-related project budget supports, the parameters for using these grant funds, the basis for Medicare and Medicaid Federally Qualified Health Center reimbursements, Federal Tort Claims Act coverage . . . and other essential benefits." HHS, HRSA, Policy Information Notice (PIN) 2008-01 at 1 (Jan. 2009).

An HHS-approved permanent service site—a key element of a health center's scope of project—is a location at which the health center's providers, either directly or through a subrecipient or established contract or cooperative agreement: conduct face-to-face visits with patients and document those encounters in the patients' medical records, exercise independent clinical judgment, and deliver services on a regular basis and on the health center's behalf, *i.e.*, under the control and authority of the health center's governing board. *Id.* at 4, 5. HHS calls for health centers to "record[] approved service sites on Form 5B" of HHS's standard form § 254b funding application. *See Documenting Scope of Project*, HRSA (Dec. 2023), https://bphc.hrsa.gov/compliance/scope-project/documenting-scope-project.

The immunity at issue arises from the Federally Supported Health Centers Assistance Act ("FSHCAA"), enacted in 1992 to ensure health centers used their funds to deliver primary care to underprivileged populations, rather than to pay "costly medical malpractice insurance" premiums. *Friedenberg v. Lane County*, 68 F.4th 1113, 1125 (9th Cir. 2023) (citing H.R. Rep. No. 104-398, at 5 (1995)). To achieve that objective, the FSHCAA authorized HHS—"in consultation with the Attorney General"—to "deem" health centers and their personnel to be PHS employees for purposes of § 233(a) immunity. Pub. L. No. 102-501, § 2(a), (b).

In 1995, Congress reauthorized the FSHCAA, made its extension of immunity to deemed PHS personnel permanent, and made several procedural modifications and clarifications designed to provide certainty and fix problems identified in the

1992 legislation—including the lack of a prospective and binding application process for deemed federal status. Pub. L. No. 104-73, 109 Stat. 777 (1995); H.R. Rep. 104-398, *reprinted in* 1995 U.S.C.C.A.N. 767, 768, 771, 1995 WL 744796, at *5–7 (1995). The 1995 amendments added § 233(g)–(n). The amendments established procedures for health centers to apply to HHS to receive expedited, prospective approval for malpractice coverage for a specified period: a single application in a form and manner prescribed by the HHS Secretary, which must contain detailed information and supporting documentation sufficient for HHS to verify that the coverage would apply to all services the particular health center provides to the center's patients. 42 U.S.C. § 233(g)(1)(D), (h). If the Secretary approved an application, the statute requires that the deeming determination "shall apply with respect to services provided . . . to all patients of the entity." *Id.* § 233(g)(1)(B)(i). Further, the Secretary's deeming determination "shall be final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding." *Id.* § 233(g)(1)(F).

As implemented, the HHS-prescribed deeming application neither requires nor permits the health center to list the sites or services for which it wishes to obtain coverage. *See*, *e.g.*, HHS, HRSA, *Calendar Year 2025 Requirements for Federal Tort Claims Act (FTCA) Coverage for Health Centers and Their Covered Individuals*, https://bphc.hrsa.gov/sites/default/files/bphc/data-reporting/pal-2025-01.pdf. Instead, HHS relies on the scope of project established in a health center's application(s) for § 254b funding. 42 U.S.C. § 233(g)(4) ("receiving" § 254b "funds" is a prerequisite).

## FACTUAL AND LEGAL BACKGROUND

Eisner is a nonprofit, federally-funded community health center which has for decades provided required primary health care and related services to meet the needs of its HHS-approved downtown Los Angeles service area. For many years, including

the period at issue, the HHS Secretary has deemed Eisner and its personnel to be PHS employees under 42 U.S.C. § 233(g); *See* Declaration of Matthew S. Freedus ("Freedus Decl."), Ex. E (HHS Notice of Deeming Action confirming final and binding deemed status for CY 2022).

In March 2007, Eisner requested that the HHS, via its Health Resources and Services Administration (HRSA), expand the approved scope of its federally-funded project to (1) increase outpatient women's health services at Eisner's main clinic, including care for high-risk prenatal patients, and (2) add California Hospital Medical Center (CHMC) as a service site at which Eisner personnel would staff a 24-hour, seven-days-per week OB-GYN call panel, thus "completing the continuum of maternity care" in Eisner's service area. Ex. A at 11; *see generally* Freedus Decl. ¶ 2, Ex. A at 3–12. A Professional Services Agreement between Eisner and CHMC attached to Eisner's request demonstrated to HHS that Eisner would exercise control and authority over services its personnel provided at CHMC to Eisner patients and unassigned patients alike. *Id.* at 11; Ex. B.

As communicated to HRSA, the change in scope was spurred by Eisner's "historical commitment to the health and well-being of women and children," and aimed at meeting the continuing, significant "need for pre- and post-natal services, including delivery" in its service area, which was marked by "poverty . . . and limited health care resources." Ex. A at 7. The need was acute: Eisner "anticipate[d] a high incidence of teen pregnancies" among its patients, knew that 41% of its service area population was medically uninsured and living below 200% of the federal poverty level, and recognized that key maternal-infant health markers in its service area were poor. Ex. A at 8, 9 (noting low birthweights and infant deaths in service area outpaced state and county rates).

HRSA approved Eisner's request in February 2008, bringing Eisner's activities at CHMC—including labor and delivery consultations, emergency room

consultations, and supervision of medical residents—within Eisner's federally-funded health center project. Freedus Decl. ¶ 4, Ex. C; Ex. A at 10. When the events giving rise to this action occurred, Eisner's 24/7 call panel at CHMC was within the scope of its federal project. Freedus Decl. ¶¶ 2, 4–5; Ex. A, C–D; *see Pediatric & Fam. Med. Found. v. Becerra*, 2021 WL 3878647, at *2 (9th Cir. Aug. 31, 2021) (concluding HHS "did not adequately explain why it was reversing its position on the federal grant status of CHMC, eight years after having approved CHMC as a health service site within the scope of Eisner's PHSA grant" in violation of the Administrative Procedure Act); *Pediatric & Fam. Med. Found. v. HHS*, No. 17-cv-00732 (C.D. Cal. July 18, 2022), ECF No. 147 (vacating HRSA's 2015 attempt to remove CHMC from Eisner's scope of project).

Defendants Kendra Segura, MD, and Catherine Jacobs, CNM, were employed by Eisner to provide OB-GYN care and services to Eisner patients presenting at CHMC, as well as to unassigned patients in keeping with the hospital's bylaws and requirements for admitting privileges.

On January 19, 2023, Plaintiff Aguilar, an Eisner patient, filed this action in Los Angeles County Superior Court, alleging injuries resulting from prenatal and perinatal care she received from Eisner personnel in January 2022, both at an outpatient clinic site and, following a referral for antepartum testing, at CHMC. ECF 1-1, ¶¶ 4, 10–15.

On July 19, 2023, the United States advised the state court that whether the Eisner Defendants "are 'deemed' to be 'employee[s] of the Public Health Service' for purposes of 42 U.S.C. § 233, with respect to the actions or omissions that are the subject of this civil action" was still "under consideration." ECF 26-3. On April 17, 2024, almost nine months after its initial notice, the United States amended its § 233(*l*)(1) notice to report to the state court that Defendants "are not 'deemed' to be [] employee[s] of the Public Health Service" for the actions or omissions related

to this action. ECF 26-5.

In September 2024, the Ninth Circuit issued its decision in *Blumberger v. Tilley*, 115 F.4th 1113 (9th Cir. 2024), *cert. denied*, No. 24-1072 (June 23, 2025). In relevant part, *Blumberger* holds that 42 U.S.C. § 233(*l*)(1) requires the Attorney General to report only the HHS Secretary's "ex-ante deeming decision" to the state court and, where a defendant was a "deemed" PHS employee for the relevant period, to remove the action to federal court, *even if* the Attorney General concludes the deemed PHS employee "was not acting within the scope of [its] employment during the allegedly tortious conduct." *Id.* at 1129–30, 1134.

In October 2024—six months after receiving notice of the Attorney General's inaccurate notice and the Attorney General's failure to correct the notice and remove the case to federal court—the Eisner Defendants removed this matter to this Court. ECF 1. The Court denied the United States' first motion to remand the case, concluding that "[i]nstead of merely stating that the status of Eisner Defendants was 'under consideration,' the Attorney General should have . . . informed the state court of the HHS Secretary's deeming designation" within 15 days and removed the case to federal court. ECF 39 (quoting *Blumberger*, 115 F.4th at 1139). ECF 39 at 6.

On May 23, 2025, the United States again moved to remand, having been invited by the Court to file a "motion to remand on the basis that Eisner Defendants were not acting within the scope of their employment." ECF 39 at 8.

**LEGAL STANDARD**

"The law applicable to determine whether a government employee was acting with the scope of employment is the law of the place where the act or omission occurred." *Kashin*, 457 F.3d at 1037 (citing 28 U.S.C. § 1346(b)(1)); *see Agyin v. Razmzan,* 986 F.3d 168, 184 (2d Cir. 2021) (applying New York state law to determine whether deemed PHS defendant acted within the scope of his employment for § 233(a)). Here, that law is California's, under which "an employee acts within

the scope of her employment when: (1) the challenged act was required by or broadly incidental to the employee's duties; or (2) the employer reasonably could have foreseen the employee's conduct." *Stoker v. United States*, No. 21-55993, 2022 WL 2452304, at *1 (9th Cir. July 6, 2022) ("Employee activity falls within the course and scope of employment when, in the context of the particular enterprise, an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.") (citations omitted).

Scope of employment is "interpreted broadly." *McLachian v. Bell*, 261 F.3d 908, 912 (9th Cir. 2001). The narrow construction applicable to waivers of sovereign immunity is inapplicable when assessing the PHS Act's comprehensive grant of absolute immunity. *Krandle v. Refuah Health Ctr., Inc.*, No. 22-cv-4977, 2024 WL 1075359, at *7 (S.D.N.Y. Mar. 12, 2024) ("The scope of the FTCA—and the scope of the United States' waiver—is a separate question which § 233 says nothing about.") (citing *United States v. Smith*, 499 U.S. 160, 162 (1991), *Hui*, 559 U.S. at 806).

**ARGUMENT**

The Eisner Defendants are entitled to absolute immunity from Plaintiffs' claims under § 233(a) and (g), which together immunize deemed PHS employees from any civil action or proceeding resulting from the performance of medical or related functions, so long as the allegedly wrongful conduct underlying the claim was within the scope of the employees' deemed federal employment. 42 U.S.C. § 233(a). (g). Each element required for § 233(a) immunity is satisfied here: (1) the Eisner Defendants were deemed PHS employees for the calendar year in which the events giving rise to this action transpired, (2) the action "resulted from" their "performance of medical, surgical . . . or related functions," and (3) their actions were performed to fulfill Eisner's statutory obligations to provide required OB-GYN

services and ensure continuity of care for an established Eisner patient.

**I. The Government Cannot Retroactively Narrow the Eisner Defendants' Deemed PHS Employee Status**

To avoid engaging in the state law scope of employment analysis, the Government urges a retroactive narrowing of the Eisner Defendants' "final and binding" deemed status. § 233(g)(1)(F); *see* U.S. Br. at 10–11. The Government's attempt to gin up an additional "threshold" test preceding the well-established scope of employment inquiry must be rejected.

First, Eisner's and its employees' deemed status is "final and binding" on both HHS and the Attorney General in this and any other action or proceeding premised on conduct that occurred within the deemed period. § 233(g)(1)(F). The statute makes clear that HHS's deeming determinations bind the Government except in limited, enumerated circumstances not relevant here. *Id.* (mandating "[o]nce the Secretary makes a [prospective coverage] determination," it "shall be final and binding. . . ."), (i) (enumerating circumstances in which, "after opportunity for a full and fair hearing," the government may revoke the deemed status of an employee of a prospectively deemed provider). Equally clear is the statute's prohibition against the very action the Government attempts to take: outside of the limited circumstances provided in 233(i), "the Secretary and the Attorney General may not determine that the provision of services which are the subject of such a [prospective coverage] determination are not covered under this section." *Id.* (emphasis added).

The "final and binding nature" of the deeming determination would be "meaningless," *Alexander v. Mount Sinai Hosp. Med. Ctr.*, 484 F.3d 889, 894–95 (7th Cir. 2007), if the United States were permitted to wriggle out of its mandated effect: "[t]he deeming … *shall apply* with respect to services provided [] to *all patients of the entity*." 42 U.S.C. § 233(g)(1)(B)(i) (emphasis added). Indeed, by the government's own admission, even an improper conferral of deemed status is final

and binding. *Alexander*, 484 F.3d at 894–95 (agreeing with United States that "even if the original deeming determination was in error, all of the parties are statutorily bound by the government's decision"); Brief of Defendant-Appellee United States of America, *Alexander v. Mount Sinai Hosp. Med. Ctr.*, No. 05-1823, 2006 WL 304057, at *15 ("As a party to this case, the United States was bound by the deeming decision made by HHS in this case, whether it was mistaken or not.").

It is clear on the face of Plaintiff Aguilar's medical records that she received—and that this action resulted from—services the Eisner Defendants provided to her as an established Eisner patient. ECF 40-2 at 1–9 (reflecting Plaintiff Aguilar's outpatient visit and testing at an Eisner "clinic," a same day referral by an Eisner provider to CHMC, and her hospital admission by an Eisner provider for a "suspected ICP"[1]). As Plaintiff Aguilar's primary care provider, Eisner (through Dr. Segura) referred, followed, and admitted her to the hospital. *Id*.

It is equally clear from the record that in 2008, HRSA approved Eisner's "change in scope request," which added CHMC as an Eisner OB-GYN service delivery site and brought Eisner's call-panel activities at CHMC within its federal job duties. Although HHS subsequently attempted to remove CHMC from Eisner's federal project, its action was declared unlawful and vacated in 2022. *See Pediatric & Fam. Med. Found.*, 2021 WL 3878647, at *2, on remand at No. 17-cv-00732-FLA (C.D. Cal.). The effect of the vacatur is to nullify HHS's attempted removal of CHMC from Eisner's scope of project, meaning that CHMC must be included as part of Eisner's annual grant application for the relevant period. *See Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 38 F.4th 34 (9th Cir. 2022); *Indep. U.S. Tanker Owners Comm. v. Dole*, 809, F.2d 847, 854–55 (D.C. Cir. 1987); 5 U.S.C. § 706(2)(A). HHS's attempt to remove CHMC from Eisner's approved scope of

[1] ICP is shorthand for intrahepatic cholestasis of pregnancy, which is a liver condition "sometimes seen during the third trimester pregnancy . . ." Mosby's Medical Dictionary, 960 (11th Ed. 2022)

project is a tacit admission that the activities Eisner performed there were grant-supported—i.e., within its health center "scope of project." Although HHS is free to change course and narrow a health center's scope of project (i.e., its deemed scope of employment), it cannot do so in a manner that would retroactively alter or restrict its deemed status, or is otherwise arbitrary, capricious, or contrary to law. 42 U.S.C. § 233(g)(1)(F) (making favorable deeming determination "final and binding" for a specified calendar year); *id.* § 233(i) (allowing Attorney General to take away a provider's deemed status but only *after* a full and fair hearing and with a *prospective* effective date).

Second, the Ninth Circuit has soundly rejected the premise on which the Government's additional, extra-textual "threshold" test relies. The immunity § 233(a) provides to deemed PHS employees is "identical to the immunity for true PHS employees." *Blumberger,* 115 F.4th at 1117 (citing 42 U.S.C. § 233(g)(1)(A)); *see Friedenberg,* 68 F.4th at 1127 ("Congress intended for deemed PHS employees to receive protection 'in the same manner' as traditional PHS employees during the coverage period."); *see also Agyin*, 986 F.3d at 177 (concluding deemed PHS physician "received from the federal government a delegation of the same legal immunity that is extended to employees of the Public Health Service"). That immunity broadly shields actual and deemed PHS employees' performance of medical and related functions undertaken within the scope of employment. § 233(a), (g). Nothing in the FSHCAA's text, purpose, or history "suggest[s] that Congress intended to limit the scope of protection by enacting § 233(g)." *Friedenberg,* 68 F.4th at 1126–27.

The Government's reliance on *Cromer v. Dignity Health*, 2025 WL 1153808, at *11 (C.D. Cal. Apr. 18, 2025) to urge the opposite result is misplaced. U.S. Br. at 12–13. The *Cromer* decision misreads § 233(g) to restrict the scope of § 233(a) immunity, in direct conflict with *Friedenberg*. *Compare Cromer*, 2025 WL

1153808, at *5, *with Friedenberg*, 68 F.4th at 1126–27. *Cromer* is also readily distinguishable because, unlike here, the plaintiff there did not have an established "patient" relationship with Eisner prior to her hospital admission. *Cromer*, 2025 WL 1153808, at * 8 (distinguishing a hypothetical case, similar to this one, where "the patient *was a patient* of the *deemed entity* whose *deemed physician* provided care") (emphasis added); *see* Freedus Decl., Ex. A, C; ECF 40-2 at 1, 9 (establishing Plaintiff Aguilar's patient status). It is clear from the *Cromer* Court's reasoning that, if presented with the facts of this case, it would find the Eisner Defendants immune because Plaintiff Aguilar was indeed "a patient of the deemed entity whose deemed physician provided care." *Id.* (citing 42 U.S.C. § 233(g)(1)(B)'s command that services of deemed defendants to "all patients of the [deemed] entity" are covered).[2]

## II. The Eisner Defendants Acted Within the Scope of Their Deemed Federal Employment When Providing Medical Care to an Established Patient

The Eisner Defendants acted within the scope of their deemed federal employment: Dr. Segura and CNM Jacobs were at all times acting within the scope of their individual employments as Eisner OB-GYN providers and in furtherance of Eisner's federal grant project when providing the prenatal and antepartum care at issue to an established Eisner patient. *See Smith v. Harbison*, No. 4:19-cv-152, 2020 WL 6216758, at *5 (M.D. Ga. Oct. 22, 2020) (concluding provision of OB-GYN services at third-party hospital "expanded obstetric options for [the entity's] patients, which is consistent with [the entity's grant] mission of providing medical services

[2] The Government's reliance on *Thomas v. Phoebe Putney Health Sys., Inc.*, 2019 WL 6039976, at *4–*5 (M.D. Ga. March 6, 2019) is likewise misplaced. *Thomas* stands for the unremarkable proposition that an activity "completely separate" from a deemed health center's grant project—also known as "another line of business"—is outside the scope of employment and thus not protected under § 233(a). *Id.* at 1, 4. Eisner, unlike the center in *Thomas*, sought and obtained HHS approval to include the activity—and all associated expenses and revenue—within its health center project.

to the underserved," even though the specific service was provided to a non-entity patient).

Scope of employment is determined in keeping with the "law of the place" where the alleged acts or omissions occurred, 28 U.S.C. § 1346(b)(1), *i.e.*, California's *respondeat superior* law. *See Kashin*, 457 F.3d at 1037. Contrary to the Government's position, the agency's FSHCAA regulation, 42 C.F.R. § 6.6, neither narrows the broad reach of § 233(a) immunity nor alters the state-law test the statute commands. *Agyin*, 986 F.3d at 184 ("[N]either 42 C.F.R. § 6.6 nor the FTCA Manual purports to alter [the state law] scope-of-employment analysis. Indeed, neither the regulation nor the manual would be able to alter the application of that state-law test."). The portions of the interpretive regulation relevant here simply paraphrase the FSHCAA's guarantee that immunity applies to suits resulting from a deemed health center's provision of approved services to an established patient. 42 C.F.R. § 6.6(c) (reiterating, for individual deemed employees, "only acts and omissions within the scope of their employment . . . are covered"), (d) (providing, for deemed health centers, "only acts and omissions related to the grant-supported activity of entities are covered"). HHS itself advances this view in agency policy. *See* HRSA Federal Tort Claims Act Health Center Policy Manual at 7 (July 21, 2014) (evincing agency position that scope of project is an aspect of scope of employment).

**A. The Eisner Provider Defendants Acted Within The Scope of Their Deemed Federal Employment**

Defendants Segura and Jacobs, both Eisner-employees hired to provide care for residents of Eisner's service area, were performing hospital-based and emergency OB-GYN services on Eisner's behalf during the relevant period. Freedus Decl. ¶¶ 2, 4–5, Ex. A, C, D; U.S. Br. at 5 (establishing Plaintiff received prenatal care at Eisner ambulatory clinic); Compl. ¶¶ 4, 11. There should be no debate that the provider defendants were fulfilling Eisner's statutory obligation to ensure

continuity of care to an Eisner OB-GYN patient. 42 U.S.C. § 254b(b)(1)(A)(i)(III), (k)(3)(A) ("prenatal and perinatal services" are required "in a manner which assures continuity"); *see also* Health Center Compliance Manual, Ch. 8: Continuity of Care and Hospital Admitting, at 36 ("The health center must provide the required primary health services of the center promptly and in a manner which will assure continuity of care services to patients within the center's catchment area."). This suit results from care Dr. Segura and CNM Jacobs provided to an Eisner patient in exchange for their Eisner salaries. *See* ECF No. 1-2 at 208 (Segura work status agreement), 210 (Jacobs work status agreement). The services were required of Eisner as a core condition of its grant funding and, by extension, its deemed federal status. 42 U.S.C. § 254b(b)(1)(A). Dr. Segura's and CNM Jacobs' conduct was not merely "typical of or broadly incidental to the enterprise undertaken by [Eisner]," *Perez*, 719 P.2d at 678–79, it was at the heart of Eisner's federal project as *explicitly approved* by HHS. Freedus Decl., Ex. A, C, D. The conduct, and the associated risks, were not just foreseeable, as required to meet the applicable state law test, they were considered and approved by Eisner's federal "employer" agency. *Id.*

That some of the services at issue were provided at a hospital, rather than entirely at an Eisner ambulatory site, is irrelevant to the scope of employment analysis. Nothing in the record suggests Dr. Segura or CNM Jacobs were "moonlighting" or working for anyone other than Eisner when they provided the care at issue; and it is unremarkable that a hospital, rather than an Eisner outpatient location, is where Eisner's providers performed urgent antepartum testing. *Cf.* HHS, HRSA, Federal Tort Claims Act Health Center Policy Manual (2014), at 8, https://bphc.hrsa.gov/sites/default/files/bphc/technical-assistance/ftcahc-policy-manual.pdf (hereinafter "FTCA Manual") (explaining coverage does not extend to "moonlighting" activities, defined as "professional activities outside of covered entity employment responsibilities and . . . not within the covered entity's approved

scope of project”). The FSHCAA expressly contemplates coverage of inpatient services “in the fields of . . . obstetrics and gynecology.” 42 U.S.C. § 233(g)(5)(B), (j) (providing remedy for denial of “hospital admitting privileges” to certain deemed providers).

In short, nothing about the services Dr. Segura and CNM Jacobs provided should be “unusual or startling” to the United States, which approved the exact activities at issue. *Stoker*, 2022 WL 2452304, at *1. It is hardly “unfair” to hold the United States liable for an activity of its employee that it specifically approved. *Id.*

**B. The Acts and Omissions at Issue Related to Grant-Supported Activity**

The conduct from which Plaintiffs’ suit arose was entirely within the scope of Eisner’s HHS-approved federal project, *i.e.*, within its “grant-supported” activity. 42 C.F.R. § 6.6(d) (reiterating scope of employment test as applied to deemed entities); *see* FTCA Manual at 8 (grant-supported activity includes “the performance of medical, surgical, dental, or related functions within the scope of the approved Federal section 330 grant project, which includes sites, services, and other activities or locations, as defined in the covered entity’s grant application and *any subsequently approved change in scope request*.”) (emphasis added); PIN 2008-01, at 2. As a starting point, the alleged acts and omissions occurred during the provision of OB-GYN services Eisner is required to provide to “all residents” of its federally designated service area. 42 U.S.C. § 254b(a)(1), (b)(1) (requiring health centers provide “health services related to obstetrics [and] gynecology” and “perinatal services”). Eisner’s health center status—the baseline requirement for it to be deemed a PHS employee—is *conditioned* on its provision of this care. *Id.*; § 254b(e)(1). Congress further conditioned approval of health center program funding applications on the center’s ability to ensure continuity of care for its patients, including by requiring HHS to determine “the center has made and will continue to make every reasonable effort to establish and maintain collaborative relationships

with other health care providers, including other health care providers that provide care within the catchment area, local hospitals, and specialty providers in the catchment area of the center, to provide access to services not available through the health center." *Id.* § 254b(k)(3).

The actual scope of Eisner's federal project is defined in its grant application and any subsequent change in scope requests, including the 2008 request to add CHMC to "further[] the mission of the health center by increasing" patient access to core services. PIN 2008-01 at 21. The Government's contrary position ignores that (1) Eisner followed its own obstetric patient into the hospital for required care in a manner that ensured continuity; (2) HHS approved Eisner's detailed change in scope request, thereby adding CHMC (as a Form 5B service site) to Eisner's federal project for OB-GYN services, and (3) the Ninth Circuit rejected the agency's effort to remove the CHMC site from Eisner's scope of project (nearly a decade after the initial approval). *Pediatric & Fam. Med. Found.*, 2021 WL 3878647, at *2. Indeed, beyond merely satisfying statutory requirements applicable to all health centers, Eisner has long made rectifying unmet maternal and infant health needs in downtown Los Angeles a significant focus of its HHS-approved federal project, including during the relevant period. Freedus Decl. ¶¶ 2, 4 Ex. A (describing unmet medical needs of target population), Ex. C (HRSA approval); *see also* 42 U.S.C. § 233(g)(1)(B), (g)(5), (j); 42 C.F.R. § 51c.102(e) (listing factors informing HHS's designation of medically underserved areas as including, *inter alia*, "appropriate ratios of primary care physicians in . . . obstetrics and gynecology to population [and] [h]ealth indices for the population of the area, such as infant mortality rate"); 42 U.S.C. § 233(g)(5)(B), (j) (contemplating coverage of "services in the fields of . . . obstetrics and gynecology" including inpatient services).

The inclusion (and failed removal of) CHMC as an Eisner (Form 5B) site for OB-GYN services merely provides an additional basis to recognize Plaintiff Aguilar

as an Eisner patient. When an individual accesses required (Form 5A) services at a (Form 5B) site, the individual does so as a patient of the health center, regardless of any pre-existing relationship. By adding the CHMC site to its scope of project, Eisner ensured that "unassigned" individuals (*i.e.*, those without a pre-established relationship with an admitting physician) would be patients of Eisner. That is the primary basis for the Eisner defendants' (rejected) claim to immunity in *Cromer* because the plaintiff there, unlike Plaintiff Aguilar, accessed Eisner's services for the first time at CHMC.[3]

### C. Eisner's Provision Of Care To Its Own Patients At CHMC Was Not An "Other Line of Business"

The Government's unsupported assertion that Eisner's activities at CHMC constituted a "separate line of business" entirely outside of Eisner's federal project is disingenuous. The Eisner Defendants were not acting or working on CHMC's behalf, or for any other "third-party," when providing care to Plaintiff Aguilar. The phrase "other line of business" is a term of art reserved for "activities that are *not* part of the HRSA-approved scope of project"—*i.e.*, where neither the cost nor any revenue generated by the activity is "included in the annual budget for the Health Center Program project." Health Center Compliance Manual, Ch. 17: Budget, at 63; *see also* GAO-18-204R, Health Care Funding: Federal Obligations to and Expenditures by Selected Organizations Involved in Health-Related Activities, Fiscal Years 2013–2015, at 2 n.8 (March 6, 2018).

The Government's radical reframing of HHS-approved activities not only misrepresents fact, but also ignores the fundamental structure of the health center program, under which an "**[a]pproval of a change in scope request is contingent on submission of a budget demonstrating breakeven (worst case scenario) or the potential for generating additional revenue**" that "must be invested in

[3] The district court's remand order in *Cromer* is on appeal. No. 25-4152 (9th Cir.)

activities that further the objectives of the approved health center project." HRSA PIN 2008-01, at 20 (citing 42 U.S.C. § 254b(e)(5)(D)) (emphasis in original). HRSA's review and approval of Eisner's change in scope indisputably demonstrates that its budget, which included all revenue and expenses associated with the CHMC agreement, brought the activities within Eisner's approved federal project. Ex. C; Health Center Program Compliance Manual, Ch. 17: Budget, at 63.

The acts and omissions at the heart of Plaintiffs' complaint occurred entirely within the scope of the Eisner Defendants' deemed federal employment: Plaintiffs' action results from Eisner employees' performance, at authorized sites, of medical functions Eisner was required to provide as part of its HHS-approved federal project.[4] Eisner was "solely responsible for paying all expenses" of the professionals it was required to "employ" to furnish the services at issue. Ex. B at 3, 8 (§§ 2.3(a), 4.1(b)). Eisner was also responsible for causing its professionals to comply with common values, integrity obligations, standards of conduct, laws, and coverage protocols, preparation of medical records, maintenance of licenses, proper DEA registrations, board certifications, medical staff memberships, and participation in governmental programs. Ex. B (§§ 2.6, 2.8, 2.9, 2.11, 3.1, 3.2, 3.3, 3.4, 3.5). It was solely responsible for the malpractice coverage and billing practices of its professionals. Ex. B (§§ 4.3, 5.2(a)). Most importantly, Eisner—not CHMC—maintained control and direction over its employees' "medical judgment or the methods by which . . . professional medical services" were provided, Ex. B at 11 (§ 4.8), and retained responsibility for terminating employees. Ex. B at 17–18 (§ 6.9). Eisner's employees, including provider-defendants Segura and Jacobs, worked solely for Eisner, not for any other entity, in fulfilling Eisner's federal project.

[4] As explained *supra*, Eisner's approved change in scope to include dedicated personnel at CHMC converted CHMC to an established service site on Eisner's Form 5B, meaning that even patients who (unlike Plaintiff Aguilar) had not received prior care at Eisner became patients when treated at CHMC by Eisner personnel.

The Government's argument that the conduct underlying Plaintiff's suit "lacks the required causal connection between the care and 'patient[] of the entity'" beggars belief. *Cf.* U.S. Br. at 14–15 (arguing care provided to Plaintiff Aguilar was outside of scope because the "Eisner Defendants were treating the Hospital's OB/GYN patients, some of whom *might* have had prenatal care at" Eisner). This suit results entirely from care Plaintiff Aguilar received within the context of her provider-patient relationship with Eisner. She was not only an established Eisner prenatal patient, Eisner personnel at an ambulatory clinic site referred her to their colleagues at CHMC for antepartum testing. Eisner's coverage of unassigned patients at CHMC is irrelevant to whether § 233(a) immunity applies to this case. *See Bray*, 97 4th at 415 (recognizing that services provided in hospital setting pursuant to "professional services agreement" between deemed health center and hospital, substantively similar to the agreement between Eisner and CHMC, were not performed on hospital's behalf and did not constitute separate line of business).

**III. The Particularized Determination Process Is Inapplicable Here**

There is no basis for the Government's contention that Eisner "required a prior particularized determination for FTCA protections to apply." U.S. Br. at 15. Instead, where, as here, services to an established patient give rise to an alleged injury, the statute mandates coverage—*i.e.*, the Secretary's deeming of an entity and its personnel "shall apply with respect to services provided . . . to *all patients* of the entity." 42 U.S.C. § 233(g)(1)(B)(i) (emphasis added); *Blumberger*, 115 F.4th at 1118 ("This deeming status applies with respect to suits initiated by any patient of the entity"); *Bray*, 97 4th at 407, 415 ("If a covered individual provided the services at issue to a patient of the covered entity, the services are covered under § 233(g)(1)(B)."). The Government's deeply flawed contrary position must be rejected.

First, the agency's preference for a particularized determination applies only

where a health center entity provides services "to individuals who are *not patients*." 42 C.F.R. 6.6(d) (emphasis added). The process, per the agency that conceived of it, does not apply to or "address coverage arrangements concerning services provided to existing health center patients." HHS, HRSA, Federal Tort Claims Act: Health Center Policy Manual at 10, § C.4 ("HRSA/BPHC does not utilize particularized determinations to . . . address coverage arrangements concerning services provided to existing health center patients."); *see O'Brien*, 56 F.4th at 149 ("With respect to patients of the health center, coverage is straightforward" and the Secretary's deeming determination applies to "all patients of the entity.") (quoting 42 U.S.C. § 233(g)(1)(B)(i)'s unequivocal command). The Government's counterfactual insistence that Plaintiff Aguilar was not an Eisner patient is easily defeated by the record, which establishes that she received prenatal care at an HHS-approved Eisner outpatient site, was referred by her Eisner prenatal provider for emergency evaluation at CHMC, underwent antepartum testing by Eisner personnel at CHMC, and was discharged by Eisner personnel with a scheduled follow-up visit at the Eisner outpatient facility. ECF 40-2 at 1, 9 (progress and discharge notes). Indeed, the Government itself concedes, as it must, that Plaintiff "received prenatal care at Eisner," U.S. Br. at 14, satisfying HHS's own test for health center patient status. *See* FTCA Manual at 8 (noting coverage turns on existence of "patient-provider relationship" established when "[i]ndividuals access care at approved sites even if they . . . may only be receiving care temporarily" or when "[h]ealth center triage services are provided . . . in person, even when the patient is not yet registered with the covered entity.").

Second, even if the FSHCAA regulation applied here, HHS's particularized determination process, which the agency promulgated to implement the FSHCAA of 1992 only, is precluded by the FSHCAA of 1995. For starters, the particularized determination process, which preceded the 1995 amendments, does not comport

with the amendments' procedural protections—*i.e.*, a single application for a prompt and advance determination (within 30 days) for a specified calendar year that, if favorable, is "final and binding" *on Secretary and the Attorney General*. *Id.* § 233(g)(1)(F). Moreover, unlike the FSHCAA itself, with its mandated deeming application process, the FSHCAA regulation does not, as the Government contends, "require" a particularized determination. U.S. Br. at 12–13 ("Eisner's 'arrangement' with the hospital *required* a particularized determination from HHS under 42 C.F.R. § 6.6(e)(4) for any care pursuant to the arrangement to be covered.") (emphasis added). Instead, the regulation uses permissive language: "the health center *should* seek a particularized determination of coverage" if it has any doubts as to coverage. 60 Fed. Reg. at 22,531, which is consistent with HRSA's initial and long -held view that its regulation is "interpretive in nature," and thus lacks the force and effect of law. Freedus Decl., Ex. F at ¶ 17 (January 13, 1997) (HRSA PIN 97-6 describing regulation as "interpretive in nature").

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's motion to remand this action and should order the substitution of the United States in place of Eisner, Kendra L. Segura, M.D., and Catherine L. Jacobs, CNM.

Dated: August 11, 2025

Respectfully submitted,

Kelly Trotter and Franzen
John C. Kelly (SBN 125609)
111 West Ocean Boulevard, 14th Floor
PO Box 22636
Long Beach, CA 90801-5636
Tel: 562.432.5855
jckelly@kellytrotter.com

*s/ Matthew S. Freedus*
Matthew S. Freedus*
DC Bar No. 475887
Rosie Dawn Griffin*
DC Bar No. 2035462

Power Pyles Sutter & Verville PC
1250 Connecticut Avenue NW, 8th Floor
Washington, DC 20036
Tel: 202.466.6550
matthew.freedus@powerslaw.com
rosie.griffin@powerslaw.com

**Admitted Pro Hac Vice*

*Attorneys for Defendants Eisner Health, Kendra L. Segura, M.D. and Catherine L. Jacobs, CNM*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for the Eisner Defendants certifies that this brief contains 6,969 words excluding the caption, the table of contents, the table of authorities, the signature block, certificate of compliance, and attachments which complies with the word limit of Local Rule 11-6.1.

Undersigned counsel also certifies that this brief uses 14-point Times New Roman font in compliance with Local Rule 11-3.1.1.